WhitakeR, Judge,
delivered the opinion of the court:
Plaintiff purchased from the War Assets Administration surplus property located on the Island of Maui in Hawaii, which was stored at the United States Marine Corps Service Depot at Kahului. It claims there was a shortage in certain items, and sues for the market value thereof.
After an inventory of the property had been taken, a brochure entitled “Maui Sales Circular #6” was circulated among prospective bidders. Plaintiff and others submitted a bid, but all bids were rejected, and further bids were solicited. Plaintiff’s second bid of $176,108 was accepted. The entire amount has been paid, except for $25,350, which plaintiff claimed was the value of the missing articles.
The missing items consisted of 11,000 Army cots, pilferage from 96 trucks, and one DeWalt Saw. These items are not involved in this litigation.
More than a year after the sale had been consummated, plaintiff claimed that additional items were missing, the total value of which it alleges was $25,887.80. For these amounts it sues in this action.
We are of opinion plaintiff is not entitled to recover.
In the first place, we think it is estopped to assert the claim sued on. When it presented its claim for the shortage *690 of cots and the saw, and for pilferage from the trucks, it made no mention of the alleged shortage for which it now sues, although it says it knew of them at that time. And when it later paid the balance of the purchase price, less the amount claimed for the cots and the saw and the pilferage from the trucks, it deducted nothing for the items for which it now sues, and made no mention of them.
When claim was made on account of the cots, the saw, and the pilferage from the trucks, defendant sent its agent Mc-Millen to Maui to investigate, but he made no investigation of the alleged shortage now asserted, because no claim with respect thereto had then been made. When, more than a year later, the present claim was first asserted, plaintiff had disposed of all of the goods and no investigation was possible.
Under such circumstances, we think plaintiff has waived the claim on which it sues, and is estopped from asserting it. Mahoning Investment Company v. United States, 78 C. Cls. 231, cert. den. 291 U. S. 675; Interstate Engineering Co., Inc., v. District of Columbia, to Use of Alco Products, Inc., 112 F. 2d 214; Fowler v. Cotton State Lumber Co., 39 App. D. C. 220; Section 412, Restatement of the Law of Contracts. Cf. Cudahy Packing Co. v. United States, 109 C. Cls. 833.
In the second place, the sale to plaintiff was on an “as is, where is” basis, and it was expressly stated again and again in the advertisement for bids and in the sales documents that there was no warranty as to quantity.
The sales circular delivered to bidders contained the following recitals:
Buyers are invited and urged to inspect property before submitting officers to purchase. * * *
* * * (1) All sales will be made “as is, where is,” (2) The purchaser assumes all obligations of removal, packing, drayage and shipping, (3) Condition is not warranted; items where marked as to condition are so marked for the purchaser’s general information. Prospective buyers are urged to inspect before purchasing.
Under the heading “Special Notice to Purchasers” this statement appears:
The quantity, kind, size and description of the commodities listed in this circular are not warranted.
*691 Also, on 60 different pages of the sales circular listing the articles to be sold, there appeared this statement:
The Government makes no warranty as to quantity, condition, kind or description. Inspection is imperative.
Plaintiff, however, says its agents made an actual check of the items advertised for sale, and verified the quantities stated in the advertisement. The proof does not support this statement. Philip Behr, plaintiff’s vice president, inspected the property prior to the first bid. He testified that he opened sample packages of the items, but made no count of the quantity of each item.
After the second solicitation of bids, Murray Satin, an employee of plaintiff, made a further inspection of the property, which was located in 40 warehouses, and in adjacent open areas, the total circumference of which was from one and one-half to two miles. Satin’s inspection consisted of entering the front door of each warehouse, walking its length, stopping from time to time to look at particular items, and leaving by the opposite door. He did not undertake to count the quantity of the several items. His inspection of all the property, located in the 40 warehouses and adjacent areas, covering an area one and one-half to two miles in circumference, consumed only one day. But he states that in June he made a physical count of the property, recording his count on tally sheets, and found that there were the shortages for which plaintiff now sues.
We doubt this testimony for several reasons: (1) plaintiff was instructed to produce his tally sheets and promised to do so, but has not done so; (2) no claim was made for these missing items in the formal claim filed on July 17, 1948, for other missing items, of equal value; (8) payment of the purchase price was made in full on October 15, 1948, except only for the shortages claimed on July 17, without any mention of the shortages now claimed; (4) the testimony of this witness does not inspire us with confidence. For instance, claim is made for a shortage of 13,500 pounds of saddle soap. The sales circular showed an estimated 15,000 pounds of saddle soap; the tally sheets on which the inventory was recorded show 15,000 pounds, but the last *692 zero was crossed out. In recording the number of pounds the checker had used one too many zeroes, and later crossed one of them out. Defendant’s agent, McMillen, checked the sales circular and made a number of corrections therein on a master copy. This master copy showed 1,500 pounds. It was shown to all prospective bidders, including plaintiff, so that they could note the corrections on their copy. Thus plaintiff was aware of the correction, but claims a shortage on the basis of a figure known to be erroneous. The proof shows that plaintiff actually disposed of 1,843 pounds of saddle soap, and, hence, it received and sold all of the saddle soap shown on the corrected inventory, of which plaintiff had knowledge.
Plaintiff was awarded the property on May 28, and took possession of it immediately thereafter. If any part of the property disappeared thereafter, defendant cannot be responsible therefor.
Immediately on taking possession, plaintiff began disposing of the property. By the time the sales documents had been signed on June 25, it had disposed of $81,689 worth, and by July 4, of $99,249.75 worth.
The property was advertised for public sale in the daily press; the sale began on July 4, and continued for three or four weeks. People from all over the island came to the sale. During the first three or four days approximately 1,000 people crowded into the warehouse area. Plaintiff had a sales force of nine people, who were wholly unable to keep watch over the property. Items were removed from the area without the necessity of producing any evidence of ownership.
Prior to delivering possession to plaintiff, the warehouses were padlocked and a Marine guard of 18 men, under the command of a first lieutenant, patrolled the area. The warehouses had no windows and had solid steel doors. The area was well lighted. There is no evidence of the removal of any items during this time.
If there was a shortage in the items claimed, it is much more likely that it occurred after plaintiff had taken possession than before. We are by no means convinced that there was a shortage in fact.
*693 For the reasons stated, we are of opinion plaintiff is not entitled to recover. Its petition will be dismissed.
It is so ordered.
LaRamoee, Judge; MaddeN, Judge; Littleton, Judge; and JoNes, Ghief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes the following findings of fact:
1. The plaintiff, Joseph Behr and Sons, Inc., is an Illinois corporation with its principal place of business in Kockford, Illinois. It has, over a considerable period of time, been engaged in the business of buying and selling a variety of surplus property including machinery and other heavy equipment. Prior to its purchase of the property known as Maui #6 it had not dealt in mosquito netting or radio headsets which are involved in this suit. It had, however, previously purchased surplus property from War Assets Administration.
2. In 1947 a great quantity of property on the Island of Maui, declared surplus by various Government agencies, was offered for sale to private buyers by the Honolulu Regional Office of the War Assets Administration. Five different sales of special types of equipment on Maui were conducted prior to the sale involved here. In late November, or early December, 1947, there still remained on the island of Maui a vast amount of miscellaneous surplus property. This material was located at four different places. The 18th U. S. Marine Corps Service Depot, Kahului; the U. S. Naval Air Station, Kahului; the United States Corps of Engineers Depot, Kahului; the office of the War Assets Administration, Wailuku. Only material stored in the area of the 18th Marine Service Depot at Kahului is involved in this action which grew out of the sixth sale on the island of Maui.
3. On or about the first of December 1947, the War Assets Administration sent Mr. Vincent A. McMillen, an inspector-appraiser attached to the Honolulu Office, to Maui with *694 instructions to inventory and rewarehouse the material at the 18th U. S. Marine Corps Service Depot (hereafter called the Marine Guard Detail), preparatory to offering that property for sale. Upon his arrival at Maui, Mr. McMillen found the Marine Guard Detail to be an area approximately iy2 to 2 miles in circumference, facing on Kahului Harbor with mountains to the rear of the area. The area contained 40 Quonset hut warehouses, each 40 x 100 feet in size. These stretched in a line along the waterfront. The area was surrounded by a cyclone fence and was entered through a gate guarded by United States Marines. Various heavy equipment was stored in the open areas outside the warehouses.
4. The Government had leased the land on which the warehouses were located from the Kahului Kailroad Company. The railroad had subsequently purchased the warehouses from the Government. From time to time the railroad had requested possession of certain additional warehouses and the surplus property stored in them was moved to other warehouses.
5. The Marine Guard Detail had been the supply depot for the Fourth Marine Division during World War II. Material in the warehouses had been sent back from combat areas such as Guadalcanal and dumped at the Marine Guard Detail at the end of the War.
6. When Mr. McMillen arrived on Maui, the surplus material at the Marine Guard Detail occupied more than thirty warehouses. Some of the warehouses were almost full, others only partly filled. There were thousands of different items which had not been sorted or segregated. The property was placed or piled in such a manner that it was difficult to move around in the warehouses or adequately determine what commodities were there. Inventories available were of little assistance, usually indicating merely that an item might be in one of several places. Some items had been withdrawn from various warehouses by the Korean Mission. It is not shown that any adequate inventory had been made, reflecting the changes of location, withdrawals or additions, after the initial deposit of property in the warehouses.
*695 7. A rewarehousing program was begun under Mr. Mc-Millen’s supervision in order that the property might be identified and catalogued for sale. In the course of re-warehousing at least three more buildings were vacated. At the conclusion of this project the material to be offered for sale occupied approximately twenty warehouses.
8. As the rewarehousing progressed a new inventory was made by Mr. McMillen and his assistants. The inventory sheets written by assistants were personally checked by Mr. McMillen. The locations and quantities shown on the original declarations of inventory were no longer adequate because the material had been shifted about with some items added and others withdrawn. The new inventory was designed to show the commodities that were in each warehouse and the approximate quantities in each category or classification, but even this new inventory contained some errors or omissions. Each item was given an identifying number as it was inventoried. The original inventory of every warehouse was made in longhand. At the end of each day a typewritten copy of the day’s inventory was sent to the Honolulu Regional Office. As the work progressed corrections were noted on the original inventory by Mr. McMillen and his assistants, but some of these corrections did not appear on copies which had already been sent to Honolulu before the errors had been noted. It was from the copies in Honolulu that the mimeographed Sales Circular was prepared.
9. First Lieutenant Richard D. Temple, U. S. M. C., was in command of the Marines guarding the material in the Marine Guard Detail from February 14, 1948, to July 21, 1948, when the Marines were withdrawn from the property. The Marines were responsible for the security of the area. Lieutenant Temple had 18 men under his command when he arrived in February. This number had been reduced to 10 when the guard was removed in July after the property had been sold to plaintiff. A sentry was stationed at the main gate and one in Lieutenant Temple’s office inside the gate. A 24-hour guard was on patrol around the warehouses which had no windows. The solid steel doors at either end of each warehouse were secured by a chain and *696 padlock. The warehouse area was fully and well lighted and in addition there was a roving patrol on the fence lines. While Lieutenant Temple was in command of the Marine Guard Detail, the security measures were adequate to protect the warehouses. It is not established that there was any theft or pilferage from the warehouses during the period when Lieutenant Temple was in command of the security detail.
10. A catalogue entitled “Maui Sales Circular # 6” was prepared from the inventory sheets mailed to Honolulu by Mr. McMillen. The brochure consisted of 88 pages, listing, among others, the items in the Marine Guard Detail warehouses by numbered lot. At the beginning of each lot appeared the following phrase: “Lot # Consisting of the entire contents of warehouses numbers -, reported to include[Emphasis supplied]. There followed a list showing the approximate quantity, unit of measure, and nomenclature of the items. The following statement was placed on more than 60 pages of the Sales Circular announcing the proposed sale of property which included the items involved in this action:
The Government makes no warranty as to quantity, condition, kind or description. Inspection is imperative.
11. When Mr. McMillen received his mimeographed copy of Maui Sales Circular #6, he compared it with the original inventory and noted many errors and discrepancies on a “Master Copy” of the circular. The corrected inventory was prepared by Mr. McMillen in the latter part of February 1948, before prospective purchasers appeared to inspect the property. He testified that he showed the corrections to every prospective buyer, including the plaintiff, and sent two copies to the Honolulu office of the War Assets Administration.
12. The property listed in the catalogue was then offered for sale. The offer provided in pertinent part:
WAR ASSETS ADMINISTRATION Honolulu Regional Office
General Information Circular Maui #6 (Hawaii)
*697 WHAT IS FOE SALE?
Heavy Construction, Industrial and Automotive Equipment; Gas Masks, Impregnated Clothing; Kitchen Utensils and Equipment; Chemicals; Tires and Tubes; Soap; Eefrigerators; Furniture; Cots; Burlap Bags; Landing Mats; Engineers Supplies; and Miscellaneous Items.
WHAT QUANTITIES MAY BE PURCHASED?
Minimum Purchase — One Lot Offers will also be considered for all property listed in this circular.
The Government reserves the right to reject offers on individual lots if it is to the advantage of the Government to accept a bid on the entire circular.
DATE OFFERS MUST BE RECEIVED:
March 15, 1948.
Negotiations will close March 19, 1948.
HOW WILL PROPERTY BE SOLD?
By Negotiation.
WHO MAY BUY?
Anyone may buy.
WHERE IS THE PROPERTY LOCATED?
On the Island of Maui, Territory of Hawaii, at locations shown in the listing.
MAY PROPERTY BE INSPECTED?
Buyers are invited and urged to inspect property before submitting offers to purchase. It is necessary for purchasers to obtain an inspection pass from WAA representative at the Marine Guard Detail, Kahului, Maui, prior to visiting inspection areas. Inspection of property may be made from Monday, March 8, 1948, through Saturday, March 18, 1948, and during the period of negotiation,. March 15 through March 19. Before actual inspection, it is suggested the custodian be contacted as per Location Guide, which is listed by Lot Numbers, contained herein. FAILURE TO INSPECT WILL NOT CONSTITUTE GROUNDS FOR ADJUSTMENT OR RESCISSION OF SALES CONTRACTS
WHERE'MUST OFFERS BE SENT?
Offers should be received at WAA Customer Service Center, Fort Ruger, P. O. Box 3228, Honolulu, Territory of Hawaii, on or before the close of business, Monday, March 15, 1948. Negotiations will terminate at the close of business, Friday, March 19,1948.
# * * * *
*698 GENERAL REQUIREMENTS:
This sale is subject to "VVAA Standard Terms and Conditions of Sale and no other terms or conditions shall be binding on WAA with the following exceptions: (1) All sales will be made “as is, where is,” (2) The purchaser assumes all obligations of removal, packing, drayage and shipping, (3) Condition is not warranted; items where marked as to condition are so marked for the purchaser’s general information. Prospective buyers are used to inspect before purchasing. $ $ $ $
SPECIAL NOTICE TO PURCHASERS:
* * * * *
THE QUANTITY, KIND, SIZE AND DESCRIPTION OF THE COMMODITIES LISTED IN THIS CIRCULAR ARE NOT WARRANTED.
PURCHASERS WILL BE REQUIRED TO REMOVE ALL ITEMS LISTED IN THIS CIRCULAR WITHIN THIRTY (30) DAYS FROM THE DATE OF ACCEPTANCE OF THEIR OFFERS UNLESS THIS TIME PERIOD IS EXTENDED IN WRITING. THIS REQUIREMENT SUPERSEDES THE TIME PERIOD SPECIFIED IN THE STANDARD TERMS AND CONDITIONS OF SALE. ALL THE CONTENTS OF EACH WAREHOUSE AND ALL THE ITEMS IN OPEN STORAGE MUST BE REMOVED BY THE PURCHASER. IF PROPERTY IS NOT REMOVED UPON EXPIRATION OF THE THIRTY (30) DAY PERIOD, THE GOVERNMENT WILL TREAT THE PROPERTY AS HAVING BEEN ABANDONED BY THE PURCHASER.
13. No attempt was made by the War Assets Administration to conceal the inaccuracies of the brochure. Mr. Mc-Millen showed the copy of the circular with notations to all prospective purchasers who came to inspect the Marine Guard Detail property, including plaintiff’s representatives Philip Behr and Murray Satin. He loaned the “Master Copy” to Murray Satin to copy the notations, but the evidence does not establish that Mr. Satin copied the changes shown.
14. Philip Behr, plaintiff’s Vice-President, received a copy of Maui Sales Circular #6 in the early spring 1948 and went to Maui to inspect the property. He testified that he *699 found that the types of materials listed in the catalogue were present in the warehouses since sample packages of the items were opened and could be seen. The evidence does not warrant a conclusion that he counted the entire quantity of each item in which he was interested.
15. After his initial inspection Mr. Behr submitted a bid for the property. All bids were subsequently rejected and the identical property was reoffered, with the time for inspection and negotiation extended. The same terms and conditions applied to the second offer.
16. Murray Satin, an employee of plaintiff, arrived in Honolulu about April 20, 1948, for the purpose of negotiating the purchase of the Maui #6 property on behalf of plaintiff. He inspected the property in the warehouses accompanied by Lieutenant Temple or one of the Marine Guards. His first inspection was rather speedily accomplished, covering all the material listed in the catalogue and located in four separate areas on the Island of Maui in one day. At that time he inspected the warehouses by entering one door, walking the length of the warehouse, stopping from time to time to look at particular items, leaving by the opposite door and moving on to the next warehouse. Mr. Satin did not take time to count the exact quantities involved. When the type of item listed was found to be present he relied upon the accuracy of the quantity as listed in the circular.
17. After inspecting the property Mr. Satin entered a bid on behalf of plaintiff for the entire catalogue listing in the amount of $176,108. The bid was dated April 80,1948, and was accompanied by a certified check for $25,000 as a bid deposit. The pertinent terms and conditions of sale were set forth on the reverse side of the bid form as follows:
CONDITIONS OF SALE:
❖ ‡ * ❖ ❖
(2) Seller makes no warranty, either expressed or implied, with respect to the property covered by the Sales Memorandum, except (a) Seller warrants it has the right to transfer title to the property; and (b) Seller warrants the accuracy of the description of the property, provided, however, that if the property is described as new, Seller warrants only that it has not been *700 used. Seller’s liability under this paragraph shall not exceed the amount of the purchase price, except for actual expenses incurred by the Purchaser for freight, warehousing, handling, or similar charges incurred by the Purchaser as a result of fault or negligence on the part of the Seller and through no fault or negligence of the Purchaser. Seller makes no representation to the effect that there will be no reduction or decline of similar or identical surplus property on any sales occurring simultaneous with or subsequent to this contract of sale.
(3) Sales are subject to such adjustment upon the request of the Purchaser as the War Assets Administrator, or his authorized representative, in his sole discretion, may determine to be equitable under the circumstances, and any such determination shall be final. Requests for such adjustments will be considered only if filed in writing in the office of War Assets Administration responsible for the sale within fifteen (15) days (or such additional period as may be allowed in writing by the Administrator or such representative) after removal of the property by Purchaser or delivery by a common carrier at the original destination.
v
SPECIAL CONDITIONS OF SALE:
Notwithstanding and in addition to any of the provisions hereinabove stated, this sale is made subject to the special terms and conditions stated in the sales circular.
IS. On May 28, 1948, the property was awarded to plaintiff. Messrs. Behr and Satin returned to Maui from Honolulu to start taking possession of the material. They found that the quantities set forth in the catalogue were inaccurate. In several instances there were fewer individual items than the catalogue indicated.
19. A shortage in the number of Army cots, originally listed for sale, was discovered within a week after the award. A number of cots stored outside of the warehouses were destroyed by a fire which had occurred after the property had been offered for sale.
20. As soon as the property was awarded, plaintiff began selling the material to individual purchasers. Between June 3 and June 25, 1948, when the sales documents were signed by which the Government officially relinquished cus *701 tody of the material, plaintiff’s sales from the Maui property amounted to over $81,689. The individual sales continued after the signing of the sales documents until plaintiff conducted an on-site sale on or about July 4, 1948. By July 4, 1948, plaintiff had sold material in the amount of $99,249.75. All the property sold on an individual basis was removed by the purchasers. With respect to sales prior to July 4, 1948, plaintiff permitted purchasers to remove the property without presenting a receipt to the Marine Guards so that the guards were unable to tell whether any thefts were committed by plaintiff’s purchasers.
21. Philip Behr authorized Murray Satin to conduct a sale of property in the warehouses on Maui. Mr. Behr returned to Eockford and took no part in the sale. Mr. Satin advertised the sale in the Maui and Honolulu newspapers. The sale began on or about July 4,1948, and continued for three or four weeks thereafter. Plaintiff had a sales force of approximately nine people. Several’of the warehouses were opened during the sale and people from all over the island came to the sale. During the first three days approximately 1,000 people crowded into the warehouse area. The number gradually diminished thereafter. Sales were on both a wholesale and retail basis depending on the status of the purchaser.
22. During the course of the sale Mr. Satin told Lieutenant Temple that he was worried because property was being-stolen. Plaintiff’s sales staff was inadequate to control the volume of business and on the first day no sales receipts were required to be shown when property was removed from the warehouse area. A system was then developed, with Lieutenant Temple’s help, whereby a purchaser had to exhibit a sales receipt to the marine sentry before material could be taken outsid.e the fence.
23. Mr. Satin left the island after the second day of the sale, leaving his employees in charge of the property. He returned at intervals thereafter, but he never returned after November 1948.
24. On or about July 8, 1948, Mr. McMillen returned to Maui to investigate plaintiff’s complaints regarding a shortage of cots.
*702 25. On July 9,1948, Murray Satin wrote to the War Assets Administration on the letterhead of Joseph Behr and Sons, as follows:
July 9,1948
War Assets Administration P. O. Box 3228 Honolulu, T. H.
Attention: Mr. M. P. SMnner, Regional Council Hear Sir:
In further reference with my conversation with you, in reference to the shortages that exist on our purchase Maui no. 6, one of the largest items of shortage is between 11,000 and 12,000 army cots. This was verified by your Mr. McMillen who no doubt has also made a report to this effect. As you most probably know there was a fire here and several thousand of these were burned.
There are many other shortages here which were not here at the time of our inspection of these materials prior to our purchase. As an example, I found 19 cases which were supposed to contain hoists of a valuable nature which were empty although packed and scrapped.
The trucks in open storage have had considerable pilfering since we inspected them and they are now of much less value than at the time we looked at them.
I am now leaving for the Mainland and our home office and will discuss the above facts with Mr. Behr at which time we shall enter our claim for the allowance that we feel we are justly entitled to. We do not expect to make any claims for many of the small quantities that exist here but we do feel that we are entitled and justly so to any large quantities that are short.
I expect to return to Honolulu in about ten days at which time I will have the pleasure of seeing you again.
Very truly yours,
Joseph Behr & Sons, Inc.
[Signed] Murray Satin.
Murray Satin.
26. On July 17,1948, Philip Behr addressed a formal claim in the amount of $25,350 to the War Assets Administration as follows:
July 17, 1948.
War Assets Administration P. O. Box 3228 Honolulu, Hawaii
Attention: Mr. M. P. Skinner, Regional Council
*703 Dear Sir:
On July 9, Mr. Murray Satin wrote to you in regard to several shortages that exist on our purchase of Maui No. 6. We have just completed discussing this matter with Mr. Satin, and we now feel that we should at this time enter a formal claim with you. The items in question are as follows:
1. 11,000 Army Cots, all of which are missing. As you know, part of this number were burned. We are entering a claim for $1.40 per Cot, or a total of $15,400.00.
2. 96 Trucks listed under Lots 16 and 17. There was a great deal of pilferage that occurred after our inspection of the premises and before the bid was actually awarded to us. We are asking an allowance of $100.00 per truck, or a total of $9,600.00.
3. One (1) DeWalt Saw listed under Lot 12, page 55. This Saw is completely missing. We are asking an allowance of $350.00.
This makes a total of $25,350.00.
We are trying to be very fair in this matter. As a matter of fact, there are hundreds of small items and some large items which are either missing or not in the condition described in the catalogue. We do not want to go into each one of these items. That would be extremely troublesome. We are listing only these three larger items and we think it is completely reasonable that you allow our claim on them in full.
May we hear from you on this matter in the immediate future.
Yours very truly,
Joseph Behr & Sours, Iho. [s] Philip Behr.
Philip Behr, Vice-President.
27. On October 15, 1948, S. Marvin Mansfield, plaintiff’s Controller, forwarded a check to the War Assets Administration in the amount of $75,758. This brought the total amount paid by plaintiff on its bid of $176,108 to $150,758. The letter stated: “We have temporarily deducted $25,350 as the amount of our claim on this matter.”
28. Plaintiff’s claim for the shortages of cots, truck parts and the saw was assigned Claim Number B.HA 653 by the War Assets Administration. By decision dated October 15, 1948, the Honolulu Begional Office allowed plaintiff $131.78 for the shortage of cots damaged and destroyed in the fire *704 which occurred after the date of pre-bid inspection. The remainder of the claim was denied. The claim for truck parts was denied because there was no evidence of pilferage. The claim for the saw was denied because the catalogue contained a duplication in the number of saws listed.
29. The San Francisco Begional Office, War Assets Administration, affirmed the decision of the Honolulu Begional Office by opinion dated February 9,1949, which provided in pertinent part:

Basis for wpholding original 663:

Alleged shortage of HfiOO Army Gots, Lots 9 and ffl: Supplementing the evidence already submitted on WAA 663, a review of the facts indicates that the purchaser’s authorized representative acknowledged receipt of Lot 9 on June 25, 1948, and Lot 12 on June 3, 1948. The Custodian (letter August 19,1948) advises that the purchaser conducted an “on-the-site” sale beginning June 30, 1948, at which time the Custodian lost all control over the outgoing shipments. Investigation of the alleged shortages was not undertaken until July 8, 1948 (see memo from V. A. McMillen, Inspector). Under these circumstances, anything could have happened between the date of the “On-the-site” sale and the date of reinspection by WAA. Moreover, by the purchaser’s agent’s acknowledgment of delivery in full, WAA’s liability was terminated as of the date of acknowledgment.
Alleged Pilfering of 96 Trucks, Lots 16 and 17: Beyond a general statement that pilfering had occurred after the purchaser’s inspection, there is not a shred of evidence to support the allegation. Without a specific and detailed claim itemizing the extent of the pilferage, there can be no further consideration being (sic) given the allegation.
Alleged Unavailability of One (1) DeWalt Saw— Lot 1%: Although it was determined that the DeWalt Saw had been duplicated on the brochure and, consequently, was unavailable, the general disclaimer of warranty applicable to this claim, as reinforced by citations noted on WAA 663, supports denial.
30. On February 11, 1949, the last shipload of Maui #6 property -was removed from the island by plaintiff.
31. The San Francisco Begional Office transmitted plaintiff’s appeal to the Central Office of the War Assets Adminis *705 tration in Washington, D. C. By letter of April 4, 1949, plaintiff was advised:
* # <S # *
Please be advised your appeal and claim have been transmitted to our Central Office in Washington, D. C., in accordance with existing regulations, and in report of March 15, 1949, your claim in the amount of $25,-350 has been allowed in part in the amount of $1,629.88 in full and final settlement thereof as an equitable adjustment.
The foregoing is arrived at on the job lot formula, which takes into consideration the value of the missing items into the total acquisition cost of a bid. Your claim covering the pilfering of 96 trucks, lots 16 and 17, was denied due to the fact that there is no evidence presented in your letter in support thereof.
Inasmuch as the Washington Office, after thorough review and consideration under applicable laws and regulations, arrived at decision as reflected above, we have no alternative but to advise that decision as rendered represents the final position of War Assets Administration in respect to your claim.
* * $ * *
Releases were enclosed with this letter which plaintiff refused to sign.
32. By letter dated April 9,1949, S. Marvin Mansfield wrote on behalf of plaintiff to express dissatisfaction with the adjustment offered plaintiff by the letter of April 4, 1949. Plaintiff’s letter states in part:
We have received your letter of April 4 in regard to Sales Document #677842 covering our purchase of surplus property on Maui No. 6 and our claim relative thereto.
We are certainly not satisfied by the allowance of $1,629.88 in full and final settlement of our claim of $25,350.00.
When we originally submitted our claim in our letter of July 17, we were careful and very considerate in this matter. There were many items missing other than the ones which we actually listed. There were literally hundreds of small items that were missing. We thought that we were being more than fair in absorbing these losses ourselves and in concentrating on the three larger items in question.
*706 We are not aware at this time of the exact method you used at arriving at an adjustment figure, but we are certainly not satisfied with it. It is not fair to make a small adjustment on a percentage basis on entire lots of material, which lots probably constituted the greatest acquisition cost to the government, but which were of no commercial value to us. In making our bid, many of such of these items were considered worthless, and as a matter of fact were actually thrown in the dump.
;Ji #
33. On June 25, 1948, Murray Satin met with Lieutenant Temple and Mr. McMillen in Lieutenant Temple’s office in the warehouse area for the purpose of signing the sales documents by which plaintiff officially took possession of the Maui #6 material and the Government relinquished custody.
Each of the sales documents signed by Satin contained the following statement:
Note. The Government makes no warranty as to quantity, condition, kind or description. Inspection is imperative.
34. After June 25,1948, Lieutenant Temple had no official responsibility for the Maui #6 property. However, he remained as custodian of the buildings and real estate leased from the Wailuku Eailroad Company until the Government’s lease expired and the marine guard was withdrawn on July 21,1948.
35. By letter dated August 18, 1949, the following formal claim was submitted to the War Assets Administration on behalf of plaintiff by Miller, Thomas and Hickey, attorneys at law:
August 18,1949
Mr. Robert Pendergast Regional Counsel War Assets Administration Navy Pier Chicago, Illinois.
Re: Joseph Behr & Sons, Inc.
Claim No. BHA-65S S/D No. 6776842
Dear Sir:
Reference is made to the above-mentioned claim heretofore filed with the War Assets Administration in con *707 nection with the failure to. receive large quantities of merchandise purchased and delivered at Maui, Territory of Hawaii, in 1948.
Under date of July 17,1948, Joseph Behr & Sons, Inc., filed a claim for $25,350.00. Subsequent to the filing of said claim, it was determined that an additional shortage in the sum of $25,387.00 was sustained upon the failure of the War Assets Administration to deliver the following items:

In connection with this additional claim, I am submitting an affidavit executed by Mr. Philip Behr who negotiated the purchase of these items.
If there is any further information you desire in connection with these claims, do not hesitate to call upon us.
Very truly yours,
Miller, Thomas & Hickey. [s] By Charles A. Thomas.
36. An affidavit of Philip Behr accompanied the claim of August 18,1949. It stated in pertinent part:
❖ * * ❖ #
That we relied for our information as to. what property was actually being sold on Circular Maui #6, issued by the War Assets Administration from the Honolulu Begional Office;
That I myself personally inspected that property and made what physical count could possibly be made prior to making such bid, and that Joseph Behr & Sons, Inc., was awarded the bid;
That an inspection of the property after the bid had been made indicated that many items were missing, and that some items had been burned, and that the listing in that Circular Maui #6 was very inaccurate;
That upon going through a physical check of the items, we determined that there was a shortage of goods of at least the value of Twenty-five Thousand Three *708 Hundred Fifty Dollars ($25,350.00), and that we submitted a proper claim in this amount;
That we have since rechecked by physical count many of the items listed in aforementioned Circular Maui #6, and that we find the following principal additional shortages:

That there are actually many more additional small shortages in large numbers of items which are actually too numerous to. list;
That all of the above checks have either been handled directly by myself or have been carefully inspected by myself.
The foregoing so-called “additional shortages” constitute the basis for the entire claim of plaintiff as set forth in the petition filed in this court.
37. The General Services Administration, successor to the War Assets Administration, assigned to the second claim the number Chi-14.16. By letter dated October 25,1949, the General Services Administration requested further information on the details of this second claim. This letter was never answered by plaintiff and no administrative decision has been rendered on this claim.
38. The evidence does not show that the 545 radio headsets listed in Lot #1 were new. Plaintiff claims $1 each for the 505 headsets which it claims it did not receive. It is impossible to determine from the evidence whether or not the “missing” radio headsets were sold by plaintiff as part of miscellaneous sales which were made.
39. The original circular showed there were approximately 2,500 yards of mosquito netting. However, McMillen corrected this to show 500 yards and advised plaintiff of the correction. Plaintiff was given access to the master copy *709 of the inventory, on which. McMillen had made various corrections, so that he might make the corrections on his own copy. This correction was made on the master copy of the original Maui Sales Circular #6. It is impossible to determine from the evidence whether or not this mosquito netting was included in the miscellaneous sales or as part of a sale of “mosquito nets” for which plaintiff received $13,694.04.
40. The saddle soap listed in Lot #4 is the only saddle soap offered in the Maui #6 catalogue. The quantity was originally recorded in the Sales Circular as 15,000 pounds. A penciled inventory made on talley sheets prepared by an agent of defendant shows the last cipher crossed out, leaving an amount of 1,500 pounds of saddle soap. The figure shown in the Sales Circular was not changed. Plaintiff was advised of this error. The soap was contained in one pound cans, packed 144 cans to a bos. Plaintiff received at least 1,843 pounds of saddle soap which he later sold for $0.07 per pound.
41. Mosquito netting bars are pieces of mosquito netting cut and bound to fit over a frame or bar which is suspended over an Army cot. They are to be distinguished from mosquito netting which is in cut lengths, in rolls or bolts, which have not been manufactured for some special use. The original inventory and the “Master Copy” of the Sales Circular lists only “Mosquito Netting” in Lot #4. However, a later copy of the Sales Circular introduced by plaintiff does have the added word “bar” in several items. The word “bar” was apparently added when a second run of the original Circular was made.
42. Although the Sales Circular lists a total of 1,000 bed rolls in Lot #7, the evidence establishes that there were only 500 bed rolls in that lot. The second group of 500 was a duplication of the first. All bed rolls were “used”, none were new. Plaintiff sold 406 used bed rolls for $0.50 each and 50 bed rolls for $1.10 each.
43. Plaintiff’s witness, Murray Satin, testified that after the award was made to plaintiff on May 28, 1948, he made an investigation about the middle of June 1948 and determined that the following items were missing:
*710 505 radio headsets 2,500 yds. netting, mosquito 16,319 mosquito netting bars 13,500 pounds saddle soap 500 bed rolls
The witness stated that he reported the missing items to the War Assets Administration at Honolulu and to Joseph Behr and Sons. There is in evidence a letter dated July 9, 1948, in which Satin referred to missing items but made no reference to any of the items listed above and involved in the claim here in suit. Satin stated that a record of his count was made on talley sheets. Plaintiff’s attorney was directed during the trial to produce these talley sheets. He stated he would do so. They have not been produced in court or made available to counsel for the defendant. Satin also testified that there was an on-the-site sale which was publicized and advertised in local papers. Plaintiff’s attorney was requested to furnish a copy of the advertisement. It has not been produced.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and its petition is dismissed.