Whitaker, Judge,
delivered the opinion of the court:
On March 24, 1954, defendant, through the United States Naval Ammunition Depot, advertised for bids on 16 items of *24 spare truck, tractor and crane parts. Plaintiff’s bid on items 8 and 9 was the high bid and was accepted. It claims there was a shortage in what it bought, for the value of which it sues.
There was attached to the invitation for bids what are called “enclosures”, which listed the parts supposed to be in each set, if no parts had been missing. Each set consisted of four boxes and they were supposed to contain the parts necessary to service two trucks, but it was stated that some parts were missing.
The advertisement described items 8 and 9 and the price plaintiff bid, as set out in the following table:

There was attached to the invitation for bids a copy of the contract to be entered into. Article 2 of the General Sale Terms and Conditions of the contract provided:
All property listed herein is offered for sale “as is” and “where is”, and without recourse against the Government.
It also provided:
The description [of the property] is based on the best available information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property, or its fitness for any use or purpose, and no claim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; this is not a sale by sample.
*25 Since no representation was made as to the quantity, kind, or quality of the product offered for sale, it required bidders to inspect the property. This was in article 1 of the “General Sale Terms and Conditions”, which reads:
1. Inspection. — Bidders are invited and urged to inspect the property to be sold prior to submitting bids. Property will be available for inspection at the places and times specified in the Invitation. The Government will not be obliged to furnish any labor for such purpose. In no case will failure to inspect constitute grounds for a claim or for the withdrawal of a bid after opening.
The truck parts for each set were in four boxes. The boxes had been securely sealed, with heavy steel bands around them, and they were stacked one on top of another to a height of 12 or 15 feet, and boxes were in front of them and alongside them, so that an inspection of the contents of each box was difficult, but nonetheless mandatory to support a claim. Star Woolen Co. v. United States, 159 Ct. Cl. 62 (1962), 309 F. 2d 409. However, the contents of each box was listed on a “packing list”, which was contained in a water-tight envelope nailed to the box. An undetermined number of items on these packing lists had lines drawn through them, indicating that the particular item was not in the particular box. (Apparently the lists had been prepared in multiple copies for use on a number of boxes.) A prospective bidder could with little difficulty count the number of boxes and examine these packing lists to ascertain what parts were missing.
In order to facilitate an inspection of the property, defendant placed on display a set of the parts in each item. In the case of item 8 the contents of the four boxes comprising a set were spread out for convenient inspection, but defendant stated to all bidders, either in the invitation for bids or when they came to inspect the property, that boxes 2,3 and 4 of 11 sets, out of the 129 to be bid for, were missing. Bidders were also told that boxes 2, 3 and 4 of the 16 sets in item 16 were missing.
Allowing for the boxes known to be missing, plaintiff offered to buy 145 sets of parts consisting of 499 boxes. Instead, there were shipped to plaintiff 696 boxes, and plain *26 tiff accepted them. They were to be paid for at a certain unit price per set.
When the boxes arrived, plaintiff’s warehouse manager had them placed in the warehouse and instructed his laborers to check the contents of each box against the “packing list” attached to each box. Apparently no record was kept of alleged shortages in each box, but, when the count had been completed, which took two or three weeks, the total number of parts received was calculated and this was compared with the parts listed on the enclosures attached to the invitation for bids, which listed the parts in each set, assuming no parts were missing. Allowance was made for the boxes known to be missing, but no allowance was made for the parts stricken from the packing lists attached to each box. Claim is made for the difference.
Although the property was sold on an “as is”, “where is” basis, and inspection was required to ascertain the quantity, kind and quality of the goods offered for sale, plaintiff made no inspection. Apparently, knowing that its friend and neighbor by the name of Aleck Bratt was to go down and inspect the property with the view of bidding on it, plaintiff chose to rely on what it might learn from him after he got back. At any rate, when Bratt returned, some of plaintiff’s officials learned from him about the missing boxes from 11 of the sets in item 8, and of the missing boxes in item 16. Bratt, however, being interested only secondarily in items 8 and 9, made no inspection of them and, hence, did not discover that some of the items on the packing lists nailed to the boxes had been stricken. He did discover that the lining set assemblies shown on enclosure 9 were missing from the sample box displayed for the inspection of bidders, but he failed to tell plaintiff’s officials of this.
Plaintiff failed to make the required inspection. It is true it was impracticable to inspect the contents of each box, but, since this was an “as is”, “where is” contract, it was necessary for it to do so in order to support such a claim as it here asserts. It could have at least examined the packing lists attached to each box and ascertained from them what items were missing. This was not only an “as is”, “where is” sale, but the invitation to bid expressly gave bidders this *27 warning, “some parts missing.” It was warned in the invitation for bids that the 145 sets it was buying were not complete sets, and the packing lists on the boxes showed that some of the parts were missing. Therefore, its comparison of the number of parts it received with the parts listed on the enclosures, multiplied by the number of sets, proves nothing.
Article 20 of the “General Sale Terms and Conditions” of the contract, providing for an adjustment in the price where there is a variation between the quantity listed and the quantity delivered, does not help plaintiff, since, in view of the statement “some parts missing” and the deletion of some parts on the packing lists, there was no representation as to the number of parts. So far as quantity is concerned, the extent of defendant’s representation was that there were 145 sets to be delivered; there was no representation as to the number of parts in each set.
Article 2 of the “General Sale Terms and Conditions” expressly provided that, since this was an “as is”, “where is” sale, “no claim will be considered for allowance or adjustment * * * based upon failure of the property to correspond with the standard expected.” This would seem to be the end of the matter. We see nothing in this case to take it out of the rule followed in many cases, the most recent of which is Star Woolen Co. v. United States, supra. Some of the others are: Paxton-Mitchell Company v. United States, 145 Ct. Cl. 502 (1959); American Sanitary Rag Co. v. United States, 142 Ct. Cl. 293 (1958); Behr and Sons, Inc. v. United States, 137 Ct. Cl. 688 (1957); Furman v. United States, 135 Ct. Cl. 202 (1956), cert. den. 352 U.S. 847; Triad Corp. v. United States, 63 Ct. Cl. 151 (1927) ; M. Samuel and Sons v. United States, 61 Ct. Cl. 373 (1925) ; Maguire and Company v. United States, 59 Ct. Cl. 575, affirmed 273 U.S. 67 (1927). This rule has been followed by a number of the Courts of Appeals. See W. E. Hedger Co. Inc. v. United States, 52 F. 2d 31 (C.A. 2, 1931); American Elastics v. United States, 187 F. 2d 109 (C.A. 2, 1951) ; United States v. Silverton, 200 F. 2d 824 (C.A. 1, 1952); Standard Magnesium Corporation v. United States, 241 F. 2d 677 (C.A. 10, 1957); Miller Harness Co. Inc. v. United States, 241 F. 2d *28 781 (C.A. 2, 1957); United States v. Hathaway, 242 F. 2d 897 (C.A. 9, 1957) ; Ellis Bros. Inc. v. United States, 197 F. Supp. 891 (D.C.S.D. Calif. 1961); Dadourian Export Corporation v. United States, 291 F. 2d 178 (C.A. 2, 1961). The Supreme Court is in accord, Lipshitz & Cohen v. United States, 269 U.S. 90.
Plaintiff is not entitled to recover. Its petition will be dismissed.
FINDINGS OE PACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized under the laws of the State of Missouri with its principal offices in Kansas City. At all times material to the issues in this case plaintiff dealt in surplus auto parts, and Sherman Glazer and Norman Glazer were the principal corporation officers.
2. On March 24, 1954, the United States Naval Ammunition Depot, Crane, Indiana, issued invitation No. B-53-54 wherein sealed bids were invited for 16 items of spare truck, tractor and crane parts. This case is concerned only with items 8 and 9. The invitation and bid read in pertinent part as follows:

The enclosures 8 and 9, mentioned above, were identical lists of the spare parts, which, if no parts were missing, *29 would comprise a complete set under items 8 and 9. Each, set as indicated in enclosures 8 and 9 consisted of four boxes with each box containing certain designated spare parts.
On the same date as the bid, April 12, 1954, plaintiff informed the supply officer at Crane by letter that it was changing its bid on item 8 from $106.05 per set to $78.85 per set, for a total price of $10,171.65, instead of $18,680.45. No satisfactory explanation for this change in bid on item 8 was given by plaintiff’s officer, Sherman Glazer. Fourteen bids were received for item 8, the average being $51.58. Fifteen bids were received for item 9 and they averaged $43.11.
3. On April 15, 1954, plaintiff’s bid, as modified, was accepted as to items 8 and 9. The portions of the General /Sale Terms and Conditions of the contract in issue provided in pertinent part as follows:
1. inspection. — Bidders are invited and urged to inspect the property to be sold prior to submitting bids. Property will be available for inspection at the places and times specified in the Invitation. The Government will not be obliged to furnish any labor for such purpose. In no case will failure to inspect constitute grounds for a claim or for the withdrawal of a bid after opening.
2. condition op property. — All property listed herein is offered for sale “as is” and “where is,” and without recourse against the Government. If it is provided herein that the Government shall load, then “where is” means f .o.b. conveyance at the point specified in the Invitation. The description is based on the best available information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property, or its fitness for any use or purpose, and no claim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; this is not a sale by sample.
# * * $ *
11. LIMITATION ON GOVERNMENT’S LIABILITY.-In any case where liability of the Government to the Purchaser has been established, the extreme measure of the Government’s liability shall not, in any event, exceed refund *30 of the purchase price or such portion thereof as the Government may have received.
12. verbal modifications.- — Any oral statement by any representative of the Government, modifying or changing any conditions of this contract, is an expression of opinion only and confers no right upon the Purchaser.
*****
15. disputes. — Except as otherwise specifically provided in this contract, all questions of fact involved in disputes arising under this contract shall be decided by the contracting officer, whose decision upon said facts shall be final and conclusive upon the parties, subject to written appeal by the Purchaser within thirty (30) days to the head of the department or his duly authorized representative, whose decision on said facts shall be final and conclusive upon the parties hereto. In the meantime, the Purchaser shall diligently proceed with performance.
$ $ $ $ $
20. adjustment for variation in quantity. — Any variation between the quantity or weight listed for any item and the quantity or weight of such items tendered or delivered to the Purchaser will be adjusted on the basis of the unit price quoted for such items; but no adjustment for such variation will be made when an award is made on a price for the lot basis. When property is sold on a unit price basis the Government reserves the right to vary the quantity tendered or delivered to the Purchaser by ten percent (10%). If the Government tenders or delivers a quantity up to ten percent (10%) in excess of that stated in the Invitation to Bid, the Purchaser agrees to accept such quantity and pay the Government therefor at the unit price set forth in this contract. If the Government tenders or delivers a quantity less than that stated in the Invitation to Bid, the Purchaser agrees to accept the quantity tendered or delivered unless the variation exceeds ten percent (10%) of the quantity stated in the Invitation to Bid. In the event of a shortage the Government will refund to the Purchaser the difference between the quantity paid for and the quantity delivered, calculated upon the basis of the unit price set forth in this contract.
4. The United States Naval Ammunition Depot, Crane, Indiana, is situated in the south-central part of the state. The depot was commissioned on December 1, 1941. Its primary mission is to load, prepare, renovate, receive, store and *31 issue all types of ammunition and to act as a principal source of supply. The station stocks all types of inert ordnance equipment, spare parts, tools and accessories as required by the Bureau of Ordnance and the Ordnance Supply Office. The area included within the depot is 62,773 acres, or about 100 square miles. Several thousand people are employed there. Military personnel assigned to the base live there, as well as several hundred civilian workers. There are four gates to the area. Marine sentries are posted at these gates to inspect all personnel and vehicles passing through them. Security police with radio-equipped trucks maintain a 24-hour watch over the entire depot. Marines patrol the depot boundaries. A security department issues identification cards and badges and keeps files on all civilian employees. Motor vehicle passes are required.
5. At the end of World War II automotive spare parts were scattered at many places throughout the Crane depot. They were eventually gathered to a central location designated as warehouse “C” and in other nearby areas. Parts were then sorted and classified according to type and make. Eventually the various parts were assembled into sets in accordance with inventory lists. These parts were preserved with heavy grease, wrapped in oilproof paper and packed in large, heavy, pine boxes lined with waterproof paper, which were then sealed. Box lids were nailed on and the boxes were encircled with heavy steel bands. In this condition the boxes were satisfactory for overseas shipment. By 1948 the spare parts, comprising items 8 and 9, which are the subject of the instant contract, were divided into sets and packed as described. Contents of the boxes were described on packing lists. The lists were placed in watertight envelopes and nailed to the boxes containing the materials set forth on the respective lists. Some of the identifying lists were on the outside and some were inside the sealed boxes.
6. On or about 1951 an order was issued that the depot at Crane would no longer be a repository for spare automotive parts except for certain “war reserve” vehicles. Over 100 carloads of such parts were then shipped from Crane to the West Coast. In 1952 those parts remaining at Crane were transferred to another building designated as *32 No. 2034. This was a so-called inert building used for dead storage of seldom-called-for materials. The building itself was constructed of concrete. It was about 150 feet long and 50 feet wide. The building had no windows. Heavy steel doors on each side of the building opened onto railroad and truck sidings. The doors were kept locked. Possibility of theft from the building was remote. No one was allowed to enter this building without being accompanied by a unit supervisor or signing for the key.
7. While stored in building No. 2034, the automotive parts were stacked one box on another to a height of 12 to 15 feet. Boxes were also stacked in front of and alongside other boxes so that it would have been very difficult, if not impossible, to count them. The location of the respective boxes of parts, however, was indicated on “locator cards” in possession of the man in charge of the building.
8. In order to enable prospective bidders to inspect the various automobile parts comprising the items which were to be offered for sale in 1954, the defendant displayed a set of each item in building No. 40 at the Crane depot. In the case of items 8 and 9 this meant that four boxes comprising one set of item 8 and the one box which comprised the incomplete set of item 9 — boxes 2, 3 and 4 were missing from each set of this item — were removed from building No. 2034 and brought to building No. 40 where they were opened and the materials spread out for convenient inspection. Presumably, the other 128 sets of item 8 and 15 sets of item 9 remained in building No. 2034. It was not practical to inspect them there because they were in sealed boxes stacked as described in the preceding finding. The general location of the boxes could have been shown. There is no evidence that any bidder sought to inspect in building No. 2034 the contents of any of the boxes on items 8 and 9 or packing lists attached thereto. To do so would have taken a week or 10 days.
9. The disposal section of the sales department at Crane was responsible for the sale of the automotive spare parts stored in building No. 2034 and for preparation of the invitation to bid and the sales catalogue. Another section of the sales department, the inventory section, supplied the infor *33 mation contained in the invitation and enclosures on the condition and description of the items. The language “some parts missing” appearing in the descriptive column of items 8 and 9 was put there by the disposal section. This is a common phrase used in Government sales contracts of surplus property to protect the Government over and above what known parts are missing. The phrase does not signify a determination that specific parts or items were missing, for it does not appear that at the time the original invitation was prepared the disposal section knew that any specific parts were missing.
10. Defendant sent the invitation to some 95 dealers in March 1954. While it was in the process of sending out these invitations the inventory section advised the disposal section that boxes 2, 3 and 4 of 11 sets of item 8 and boxes 2, 3 and 4 of all 16 sets of item 9 were missing. The disposal section then included this information on invitations not yet mailed. The disposal section also mentioned the fact of these missing boxes to every prospective bidder who visited the depot to inspect the material offered for sale. While plaintiff did not have one of its officers make such an inspection they were advised of these missing boxes and took this information into consideration in preparation of plaintiff’s bid. Plaintiff bid on items 8 and 9 which plaintiff understood to consist of 499 boxes of auto parts.
As shown in finding 2, enclosure 8 to the invitation indicated that each set consisted of four boxes with each box ostensibly containing certain designated parts. Item 8 consisted of 129 sets which meant a total of 516 boxes. It was found, however, as indicated above, that 11 sets of item 8 were missing boxes 2,3 and 4, or a total of 33 boxes, thus leaving item 8 with a total of 483 boxes.
Enclosure 9 to the invitation shows that each set consisted of four boxes with each box ostensibly containing designated parts. Item 9 consisted of 16 sets, which meant a total of 64 boxes had they all been there. However, bidders, including plaintiff, were informed that boxes 2, 3 and 4 were missing from all 16 sets of item 9, a total of 48 missing boxes. This left item 9 with only 16 boxes representing 16 sets. In summary, the invitation and information given by defendant to *34 bidders showed that items 8 and 9 consisted of 499 boxes. Personal inspection at the site would have revealed lining set assemblies missing from box 1 of item 9 and possibly other parts as indicated by lines drawn through packing lists attached to the boxes.
11. Plaintiff did not have one of its own employees or officers inspect the materials for sale at Crane but chose to rely upon an inspection made there by a friend and business neighbor, one Aleck Bratt of Kansas City, who was a competitive bidder with plaintiff for items 8 and 9. Mr. Bratt did not discuss his trip with plaintiff before making it nor go to Crane for plaintiff. On request of the plaintiff’s officials he did report to them on what he saw at Crane when he visited them upon his return home. Bratt sold auto and tractor parts mostly to other dealers while plaintiff had a retail and export business in auto parts. He informed plaintiff’s officials, the Glazers, that 11 sets of item 8 were missing boxes 2, 3 and 4 and that all 16 sets of item 9 were missing boxes 2, 3 and 4. He also informed plaintiff that the parts comprising items 8 and 9 were new and that the Glazers would be wasting their time to look at them to determine their condition. He did not relate any conversations he had with defendant’s agents at Crane. He did not advise plaintiff that he regarded some parts as junk. He did not reveal to plaintiff that he found certain additional things missing from the sample boxes, namely, the lining set assemblies shown on enclosure 9 to the invitation to bid. Bratt himself submitted a bid on items 8 and 9. His bid on these items was in the amounts of $62 per set for item 8 and $45 per set on item 9. Bratt did not reveal his bid to plaintiff. Plaintiff relied on the information supplied by Bratt in submitting a bid, which defendant accepted.
12. Mr. Bratt was primarily interested in items other than numbers 8 and 9. He was interested in tractor spare parts, items 3, 4, 5 and 6, and the Crane spare parts, items 7,15 and 16. He submitted bids on these items on behalf of his firm, Jake Bratt & Sons, Inc. His bid on items 8 and 9 was under the name of Cohn Bros. Auto Company with which he had a private and personal side arrangement. Bratt asked and *35 was given permission to inspect tbe tractor items in warehouse No. 2034 where he counted the boxes to make sure they were all there. He did not have the time to examine items 8 and 9 in this warehouse, which he considered would take a week or more. He was told by defendant’s agents and understood that the items for sale might be “a little short or a little long.” Bratt was not interested in all of the auto parts he saw on display, thought some parts were junk, and did not see other parts which were supposed to be there according to the list accompanying the copy of the invitation which he had. He made no bid estimate on such parts.
13. Upon payment of the purchase price the surplus parts comprising items 8 and 9 were shipped to plaintiff via sealed truck under bills of lading on May 3, 5 and 6, 1954. The May 3 bill of lading listed 315 boxes, the May 5 bill of lading listed 276 boxes, and the May 6 bill of lading listed 150 boxes, or a total of 741 boxes for the three shipments. Upon receipt of the shipments it was found that the boxes received equaled the quantities shown on the bills of lading except for the May 3 shipment which plaintiff asserted contained only 270 instead of 315 boxes, or a shortage of 45 boxes. Plaintiff advised defendant of this alleged shortage by telephone and confirmed it by letter on May 19, 1954. Defendant issued a corrected bill of lading for the May 3 shipment showing 270 instead of 315 boxes of automobile parts. Thus, plaintiff received 696 boxes instead of the 499 expected by plaintiff at the time plaintiff bid and as demonstrated by enclosures 8 and 9 to the invitation as modified by defendant’s advice about specific boxes missing from the sets bid upon.
14. When the parts purchased by plaintiff arrived at plaintiff’s warehouse they were received and stored under supervision of Robert W. Silsby, plaintiff’s warehouse manager. He was assisted by three or four laborers. He did not count the boxes received but someone did do so for plaintiff. Silsby noted one or more boxes had broken bands. He thought this might have been the sample display box. Plaintiff’s warehouse was large and considerable quantities of materials were moving in and out-at all times. Silsby *36 thought it was possible but not probable that one or two boxes could have been mislaid in the warehouse.
15. Silsby instructed the laborers to check the contents of each box against the packing list attached to each box. Silsby and his workers noted that some of these packing lists had lines drawn through certain of the items listed thereon. These lines indicated that those particular parts crossed out were missing from the box to which the list was attached. No record was kept of what was stricken out on the packing lists. Plaintiff did not preserve the packing lists and thus they are not available for corroboration of plaintiff’s initial method of verifying alleged shortages of materials received.
16. It took 2 or 3 weeks to complete the making of the inventory at plaintiff’s warehouse. When the physical count of individual parts received had been completed by plaintiff they were consolidated to determine the total number of parts which plaintiff allegedly received of items 8 and 9. Silsby was then given enclosures 8 and 9 of the invitation wherein all of the parts were listed which would comprise a complete set of items 8 and 9 if no parts were missing. Silsby then prepared a schedule to reflect the difference between what plaintiff alleges it should have received and what it allegedly did receive. This schedule, in evidence, contains three columns. The first column consists of parts received as per the inspection and count at plaintiff’s warehouse. A third column consists of the number of parts plaintiff contends it expected would be received, as illustrated by enclosures 8 and 9 to the invitation, modified by the parts plaintiff knew were missing when it bid. This column has not been reduced to the extent that parts were scratched off the packing lists. To this unknown extent the third column contains excessive quantities. The second column represents the difference between the first and third columns and constitutes the parts plaintiff says it should have received but did not.
17. Plaintiff did not accept defendant’s attempted clarification of the figures in the May 3 bill of lading as a typographical error and on June 4,1954, appealed to the contracting officer as follows:
*37 Reference is made to sale Invitation B-53-54, Items 8 and 9, awarded to us on contract N164s-5574 in the amount $11,428.45. After many telephone conversations with Mr. Hatfield, our telegram of May 12, your telegram of May 17, our letter of May 19th, and your corrected bill of lading, we do not accept this contract as complete until we have received the balance of merchandise sold to us on this contract.
We request a Navy inspection of the merchandise received by us as we find a great quantity of merchandise has not been shipped to us, and consequently, we feel that the Navy should inspect and verify these shortages. We have had qualified warehousemen check this merchandise and they found terrific shortages on most of the items.
Should the Navy be unable to deliver the shortages to us, and since we have paid in advance for this merchandise, we feel that the Navy should reimburse us $6,347.00 for such shortages.
Besides our original purchase price of $11,428.45, we have expended large amounts of money and time on this transaction, and therefore, feel that we should either receive the balance of the merchandise or be reimbursed within seven (7) days of the date of this letter.
18. The contracting officer denied plaintiff’s appeal on June 14, 1954, in a letter addressed to plaintiff and reading as follows:
Reference is made to your letter of 4 June 1954 relative to Items 8 and 9 of Contract N164s-5574, Invitation to Bid B-53-54. Both of the items in question have been delivered and all of the material considered to be a part of Items 8 and 9 has been definitely shipped.
Your attention is invited to the fact that the material was advertised on an “as is” basis and the description covering Items 8 and 9 definitely stated that some of the parts were missing. It was known by all prospective bidders, who inspected the material, that 11 sets of the 129 sets comprising Item 8 were missing boxes 2, 3, and 4. Further, it was known, by all bidders inspecting the material, that boxes 2, 3, and 4 were missing from each of the sets in Item 9. In both cases these sets were packed in wooden boxes which had originally been packed several years ago and it is known that none of these boxes were tampered with.
It is felt that the bid price submitted by your firm was in line with all other bids received. Furthermore, all of the bidders who personally inspected this ma *38 terial were well aware tbat shortages did exist in Items 8 and 9. This Depot’s visitor’s log does not indicate that a representative of your firm inspected the material prior to submitting a bid. In the future, it is suggested that a representative of your firm inspect the material that is being advertised for sale prior to your submitting a bid for that material.
In accordance with paragraph 15, General Sale Terms and Conditions, it is the opinion of the Contracting Officer that no adjustment can be made concerning the existing missing parts in Items 8 and 9.
Plaintiff at no time told defendant that an agent would or had inspected the property on plaintiff’s behalf.
19. By letter of June 21,1954, plaintiff appealed the decision of the contracting officer to the Secretary of the Navy, and contended the adverse decision was in error and that plaintiff was entitled to an adjustment under paragraph 20 of the contract, that the material was offered for sale on a unit price basis per set, each set to include items shown on enclosures 8 and 9 which accompanied the invitation to bid, that the materials had been inspected on behalf of plaintiff and that plaintiff was entitled to consider that the only missing boxes were Nos. 2, 3 and 4 hi 11 of 129 units of item 8 and boxes Nos. 2, 3 and 4 in all 16 units of item 9. Plaintiff listed the specific spare parts it contended were missing over and beyond those known to be missing at the time of the bid.
20. Thereafter, the Armed Services Board of Contract Appeals, Navy Panel, dismissed the appeal by decision dated April 26, 1956, on the ground that the claim was not within the jurisdiction of the board since it said questions of law involving the interpretation of the terms of the governing contract were raised by the appeal.
21. Plaintiff claims as the measure of its alleged damages the sum of $5,635.91 representing the alleged fair wholesale market value of the individual parts it claims it should have received but did not. Plaintiff’s evidence of fair market value is the only evidence of such value in the record. It is based upon a wholesale auto parts catalogue, apparently issued in 1949, containing quotations plaintiff regards as *39 reasonable market prices for 1954. Plaintiff did not rely on the prices in this catalogue when making its bid in 1954. In preparing its bid plaintiff used market prices, Government acquisition costs, and plaintiff’s own supply and demand. Plaintiff’s resulting bid value on the individual parts in issue here, now adjusted for lining set assemblies Bratt did not find at Crane and did not tell plaintiff about, is approximately $1,745.
22. In submitting its claim of damages, plaintiff does not give consideration to the fact that, had it made its own inspection at Crane, it would, as did Bratt, have noticed certain parts were “junk” and would not have attached a bid value to them or would have observed that parts were missing in addition to those identified by defendant. Bratt did not attach any value to several of these parts he considered as junk or as missing. Plaintiff also considers that the caveat in the invitation, “some parts missing,” refers only to the parts described in finding 10 and not to any others which might have been revealed as missing by attention to the packing lists. Plaintiff does not consider that the sale “as is,” without recourse against the Government as to quantity or representation, vitiates its claim. Plaintiff considers that its damages are properly measured by individual parts as contrasted to the number of boxes received or sets bid upon or a refund of the purchase price. The evidence does not establish that the units received by plaintiff from defendant were less than 10 percent of the quantity of units purchased. The proof is inadequate, also, to support any finding that any of the sets bought by plaintiff were lost or stolen after purchase, either at Crane or at plaintiff’s warehouse.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.